UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>Plaintiff,<br><br>v.<br><br>CLEARWATER PAPER CORPORATION<br><br>Defendant. | Case No.  3:13-cv-00461-BLW<br><br>MEMORANDUM DECISION AND ORDER |

Before the Court is Defendant Clearwater Paper Corporation's Motion for Summary Judgment (Dkt. 31). The Court heard oral argument on June 9, 2015, and ruled from the bench, denying summary judgment. This written decision memorializes the Court's oral ruling.

## BACKGROUND

Plaintiff Thomas E. Perez, in his capacity as Secretary of Labor for the United States Department of Labor, asserts a claim against the Clearwater Paper Corporation under the whistleblower provisions set forth in Section 11(c) of the Occupational Safety and Health Act of 1970. The Secretary alleges that Clearwater retaliated against its former employee, Anthony Tenny, because he complained to the Occupational Safety

and Health Administration ("OSHA") about red cedar dust in its Lewiston, Idaho sawmill.

Tenny worked at the Lewiston sawmill owned by Clearwater for approximately six years, during which he earned several promotions and received only positive performance evaluations. According to the Secretary, this changed after Tenny began making safety complaints about the levels of red cedar dust in the mill. The Secretary alleges that after Tenny made these complaints, which Tenny's supervisor did not address, Tenny was subject to "several distinct employment actions," including suspension, being subject to a drug test without cause, and ultimately termination. *Pl's Resp. Br.* at 2, Dkt. 33.

1.      **Tenny's Employment and OSHA Complaint**

Tenny's employment at the mill began in February 2004, and by July 2005, he was working as a benchman or a "filer." *Def's SUF* ¶ 3, Dkt. 31-1. Filers are responsible for "benching" (preparing and repairing) blades for their assigned saws and performing certain routine maintenance on those saws. At the time Tenny worked at the mill, the filers were supervised by File Room Supervisor Guy Ciechanowski, who reported to Sawmill Superintendent Ron Schmittle. *Id.* ¶ 4. Schmittle reported to Mill Manager Dana Schmitz. *Id.*

In April and May of 2010, according to Tenny, the mill processed Western Red Cedar when the dust collection was regularly inoperable. *Pl's SUF*. ¶ 1, Dkt. 33-1. Western Red Cedar is drier than other types of wood and, consequently, creates more

dust than other species when processed. *Id.* Tenny maintains that the dust collection system was inoperable roughly 50% of the time. *Id.* And during these times, the dust was so thick in the air at the mill that workers had trouble breathing, visibility was difficult, and surfaces became slick. *Id.*

Tenny says that he complained to his supervisor, Ciechanowski, about the dust posing a safety and health hazard on multiple occasions throughout April and May 2010, Ciechanowski refused to take action. *Id.* ¶ 2. *Id.* Because Tenny perceived that Ciechanowski was doing nothing to address the issue, Tenny contacted OSHA and spoke with an inspector regarding his concerns about the red cedar dust. Tenny filed a formal complaint with OSHA on May 19, 2010. *Id.* ¶ 3.

Tenny did not tell anyone at the mill that he had complained to OSHA because he feared that management would retaliate against him if it became known he had made the complaint. *Id.* ¶ 6. Nevertheless, Tenny noticed that Ciechanowski began treating him differently after he made the complaints. *Id.* at ¶ 7. Tenny claims that Ciechanowski started "overly scrutinizing his work and demanding additional work of him as compared to the other saw filers." *Id.*

2. **Tenny's Non-OSHA-Related Complaints**

Around the time that Tenny complained to Ciechanowski about the red cedar dust and made his OSHA complaint, Sawmill Superintendent Ron Schmittle began conducting meetings with File Room employees to address concerns about communications, training and other issues, including concerns that Tenny had raised during one-on-one

**MEMORANDUM DECISION AND ORDER - 3**

conversations with Mill Manager Dana Schmitz. *Def.'s SUF* ¶ 4. Schmitz testified that he felt Tenny was trying to control the discussion, push his own agenda, and use these meetings to criticize co-works to whom he felt superior. *Id.* ¶ 8.

After the meetings began, Tenny began emailing Schmitz with meeting summaries, which accused Ciechanowski of being "unprofessional," lacking "a basic level of leadership to be in a supervisory position," "irrational", and "suggesting ideas that are waste of time and resources." *Id.* ¶ 9. The summaries also made accusations against Schmittle, including that Schmittle conveyed "misleading and misinformations" and conducted meetings in an "autocratic style." *Id.* Schmitz did not counsel Tenny about the emails, but apparently he became irritated after several weeks of the emails because Tenny kept raising new issues as his previous ones were addressed, complained about issues that no other filers were mentioning, and became more vocal about his issues and "vicious" in his criticisms of Schmittle and Ciechanowski. *Id.* ¶ 11.

On June 16, 2010, Tenny confronted Ciechanowski about whether or not he had posted a notice informing filers that an upcoming meeting had been cancelled due to Schmittle's absence. Tenny contends that Ciechanowski told him to dig the note out of the garbage, and when he did so Ciechanowski snatched it away and called him insubordinate. Ciechanowski contends he only called Tenny insubordinate after Tenny called him a liar and blocked the door so he could not enter his office. *Id.* ¶ 17.

### 3. Tenny's Suspension and Termination

On June 18, 2010, the human resources manager, Dick Rosholt, and Schmittle met with Tenny, primarily to discuss the June 16 confrontation with Ciechanowski. Schmittle told Tenny that he had investigated and had concerns about the incident but emphasized that Tenny could gain nothing by going "toe-to-toe" with Ciechanowski. Tenny responded that he felt responsible for letting others know about the cancellation, and Schmittle told him that he did not want Tenny being the communicator on shift, but did say that Tenny could help "make sure to get the right message around." *Id.* ¶¶ 19-21.

During the same meeting, Schmittle told Tenny that he understood Tenny would be leaving soon as the end of his shift was approaching but that Tenny should not to be surprised if some of the saws were running "split-gauge" blades on Monday because they planned to begin testing the blades that evening. Schmittle also said he planned to stick around to make sure that the night shift knew what they were doing. *Id.* ¶ 22. Schmittle never told Tenny that the decision had not been made or that it was only tentative. However, after a later discussion with Ciechanowski, Schmittle decided to postpone using the split-gauge blades until the following week and then left for the weekend. *Id.* ¶ 23.

After the meeting with Schmittle, Tenny went back to his bench to finish up a blade and assist trainee Allen Brown. Brown left the mill at 3:35 pm, but Tenny did not leave until 5:01 p.m. According to Clearwater, Tenny had no reason to stay beyond his assigned shift. *Id.* ¶ 27. According to Tenny, however, he stayed after Brown left because

**MEMORANDUM DECISION AND ORDER - 5**

he realized that the filers from the next shift did not know that the mill would be running split-gauge saws that night. He also realized that he mill would probably run out of regular gauge saws that night because there was a filer who had fallen behind on his work. Tenny knew this would cause downtime and a loss of production. *Pl's SUF* ¶ 13.

Tenny looked around for Schmittle and Ciechanowski, but they had gone home. Tenny spoke instead with the production supervisor for the night shift, Randy Erdman. Tenny said, "Hey Randy, Ron told me in a meeting I just had with him a few minutes ago that they were going to run the split-gauge saws tonight." Erdman replied, "There's no reason not to run 'em tonight...We'll probably have to run them due to default." *Id.* According to Clearwater, Tenny then "informed [Erdman] that he had hauled [the split-gauge blades] out and they were putting them on the Band mills as we speak." *Def's SUF* ¶ 27. Tenny also asserted that he had "communicated to night shift to run the saws, since no one else could." *Id.*

On June 21, 2010, Tenny was called to a discipline meeting and informed that he was being suspended for staging the split gauge saws. *Pl's SUF* ¶ 17. Schmittle told the assembled group that the last thing he had told Tenny on June 18th was that "the saws wouldn't be used until Monday. I told you that myself." *Id.* Schmittle claimed at this meeting that he had explicitly told Tenny not to run the saws and that the decision about running them had not yet been made. He further claimed that Tenny had told him on June 18 that he was going home after the meeting. *Id.* Tenny recalled the conversation differently, and so Schmittle's comments upset him. *Id.* During the meeting, Schmittle

**MEMORANDUM DECISION AND ORDER - 6**

apparently perceived that Tenny was becoming extremely agitated, beyond what he regarded as normal, and thus he elected to refer him for a drug screen at the on-site clinic. *Def's SUF* ¶ 30.

After the suspension meeting, Tenny visited Schmitz's office and quietly knocked on the door. He calmly asked if he could speak with Schmitz for a few minutes and Schmitz invited him to sit down. Tenny says he did not yell and at no point did Schmitz ask Tenny to leave. Tenny recorded the less than two-minute long conversation. *Pl's SUF* ¶ 19.

Schmitz testified at the union's arbitration hearing of Tenny's termination. At that hearing, Schmitz testified that following the suspension on June 21, 2010, Tenny "banged" on his door and "barged into his office." Schmitz was also interviewed by OSHA on June 29, 2011. Schmitz told OSHA that after Tenny was suspended and drug tested on June 21, 2010, Tenny came to his office, raised his voice at him, yelled at him, had to be asked three times to leave and then yelled something as he was walking down the hall. Schmitz claimed, "I had to ask him to leave my office because he was standing in there yelling at me over how he had been set up and all this other B.S. and I finally had to tell him to leave. Several times." *Id.* ¶¶ 20-21.

On June 24, 2010, while suspended, Tenny responded to an email sent by one of Clearwater's vendor/contractor representatives who Tenny considered a friend. *Id.* ¶ 22. The vendor representative apparently asked what was going on, and Tenny told him that

Schmittle, Ciechanowski, and Clearwater had set him up in retaliation for an harassment charge Tenny had made against Ciechanowski. *Def's SUF* ¶ 30.

Schmitz met with Schmittle and Sawmill human resources manager Dick Rosholt to discuss what action should be taken against Tenny for his conduct. With input from Schmittle and Rosholt, Schmitz decided to terminate Tenny's employment. The reasons Schmitz cited for Tenny's termination from employment included Tenny decision to stage the split-gauge blades on the evening of June 18, 2010, and his post-suspension email to the vendor/contractor representative. Clearwater implemented Schmitz's decision by terminating Tenny on June 25, 2005. *Pl's SUF* ¶ 32. Clearwater did not follow its progressive discipline policy in deciding to terminate Tenny.

According to Tenny, the same morning that he was suspended and drug tested, Schmittle told Mr. Tenny, "I know you're the one that filed the OSHA complaint." *Pl's SUF* ¶ 8. Another filing-room employee, Joe Rybicki, testified that he spoke with Ciechanowski on the afternoon of June 18, 2010, and Ciechanowski also told him that the Mill would be running split-gauge saws that evening. Rybicki worked the evening shift and participated in the decision to run the split-gauge saws, but was not disciplined for it. *Id.* ¶ 14.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

To establish a prima facie claim for wrongful discharge under OSHA section 11(c), the Secretary bears the burden of proving that (1) Tenny engaged in a protected activity; (2) Clearwater took subsequent adverse action against Tenny; and (3) a causal connection exists between the protected activity and the subsequent adverse action. *Schweiss v. Chrysler Motors Corp*., 987 F.2d 548, 549 (8th Cir. 1993).

A causal connection is established with evidence from which a fact finder could "reasonably infer" that the adverse action was in response to the protected activity. *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989). Because it is often difficult for plaintiffs to produce direct evidence "[t]he evidence necessary to support the allegation of a causal connection for a prima facie case may be circumstantial, i.e., 'proof

that the [adverse action] followed the protected activity so closely in time as to justify an inference of retaliatory motive.'" *Schweiss v. Chrysler Motors Corp.*, 987 F.2d 548, 549 (8th Cir. 1993). *See also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

Clearwater argues that summary judgment should be granted in its favor because: (1) Schmitz did not know that Tenny had made a complaint to OSHA, and he alone made the decision to fire Tenny, and therefore there is no causal connection between Tenny's termination and his OSHA complaint; (2) Tenny engaged in several "intervening acts," which severed the causal chain; and (3) Clearwater suspended Tenny for legitimate, non-retaliatory reasons.[1]

### 1. Clearwater's Knowledge

Clearwater argues that the Secretary cannot establish a causal connection between the protected activity and the Tenny's termination because Schmitz made the decision to fire Tenny, and he did not know that Tenny had made an OSHA complaint. But Tenny has testified that Schmittle told Tenny on the morning of the day he was suspended and drug tested that Schmittle knew Tenny had called OSHA and complained, and Schmittle and Rosholt both testified that they were involved in the decision to terminate Tenny's

---

[1] Clearwater first argues that Ciechanowski's alleged harassment of Tenny does not rise to the level of an adverse employment action. Clearwater may be correct, but the argument is a red herring because the Secretary claims that Clearwater suspended and terminated Tenny because he engaged in protected activity, and there is no question that the suspension and termination qualify as adverse employment actions.

employment. In addition, Schmittle drafted and signed the June 25, 2010, Personnel Action Form terminating Tenny and participated with others in the decision to suspend Tenny. These facts raise questions regarding (1) whether Schmittle believed that Tenny made a complaint to OSHA, and (2) whether Schmittle participated in the decision to terminate Tenny, or whether Schmitz acted alone.

Even if Schmitz did act alone in deciding to terminate Tenny, issues of material fact exist regarding whether those who were aware of Tenny's protected activity influenced or manipulated Schmitz's decision. The Supreme Court has held that an employer may be liable for the act of a supervisor motivated by retaliatory animus if the supervisor intended to cause an adverse employment action, and if the supervisor's act is the proximate cause of the ultimate employment action – even if the supervisor did not make the ultimate employment decision. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011). Similarly, the Ninth Circuit has held that if a supervisor who exhibits discriminatory animus influenced or participated in the decision-making process leading to an adverse employment action, a reasonable factfinder could conclude that the animus affected the employment decision. *Dominguez–Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039–40 (9th Cir. 2005). Thus, if the facts at trial show that Schmittle knew Tenny had made an OSHA complaint, and that he somehow influenced Schmitz's decision to terminate Tenny, the jury could conclude that animus motivated the employment decisions.

**MEMORANDUM DECISION AND ORDER - 12**

### 2. Tenny's Alleged Intervening Acts

Clearwater also argues Tenny engaged in intervening acts that broke the causal chain between Tenny's protected activity and his suspension and termination. Again, however, questions of material fact exist with respect whether these "intervening acts" actually motivated Clearwater's decision, or whether Clearwater merely seized on these acts as a pretext for retaliation.

Specifically, Clearwater contends that the various complaints about procedures and other operational issues Tenny made *after* making the complaint to OSHA is what motivated Clearwater to suspend and terminate Tenny, and not his complaint to OSHA. But there is evidence that Tenny began complaining about general procedural and operational issues in the File Room well before he made the OSHA complaint. Moreover, Tenny was never disciplined for any of these complaints under Clearwater's progressive discipline policy. Both of these facts call into question Clearwater's story that they suspended and terminated Tenny because of the "new" complaints he raised after making his complaint to OSHA.

It should also be noted that Tenny's decision to contact OSHA and make a complaint could be viewed as part of the same pattern of allegedly disruptive conduct that Clearwater acknowledges caused it to suspend and terminate Tenny. Therefore, it is difficult to untangle Tenny's OSHA complaint from the other complaints Clearwater claims caused it to suspend and terminate Tenny. All of these facts together preclude the Court from finding, as a matter of law, that these supposedly later "intervening"

complaints caused Clearwater to take action against Tenny and not Tenny's complaint to OSHA.

### 3. Clearwater's Proffered Reasons for Suspending and Terminating Tenny

In this same vein, the Court also finds that questions of material fact exist with respect to the question of whether Clearwater's proffered reasons were a pretext for retaliation. As the Secretary points out, the temporal proximity between the OSHA inspection on May 29, 2010, and the adverse employment actions that Clearwater took against Tenny on June 21, 2010, and June 25, 2010, may, by itself, suggest pretext. *See Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) ("In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext."). This inference only grows stronger when the temporal proximity between Clearwater's learning of the results of its own testing in a company memo dated June 18, 2010, and Tenny's suspension and termination a few days later is taken into account.

Other facts create a triable issue on pretext. First, as noted above, Clearwater did not follow its progressive discipline policy in deciding to suspend and then terminate Tenny, which can also create a triable issue of pretext. *Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1113 (9th Cir. 2011).

Second, the Secretary has presented evidence that Clearwater has provided somewhat shifting explanations for terminating Tenny. Clearwater claims that Tenny was suspended and then ultimately fired, primarily, for making a management decision to stage the split

**MEMORANDUM DECISION AND ORDER - 14**

gauge saws on the night of June 18. According to the Secretary, Schmittle claimed at the June 21 suspension meeting that he explicitly told Tenny *not* to run the saws and the decision about running them had not been made. Then, in the later Personnel Action form documenting the reasons for Tenny's termination, Schmittle equivocated slightly, indicating that he told Tenny that they *may* run the split gauge saws. Finally, in a later interview with an OSHA inspector, Schmittle and Rosholt apparently said that Tenny was not told the split gauge saws would be run on the night of June 18, and that it was made clear that they did not want to run the split gauge saws that night and that they wanted to wait until Monday to run them. Tenny's recording of the actual conversation, however, reveals that Schmittle did tell Tenny that the split gauge saws would be run the night of June 18. Other Clearwater employees support Tenny's version of events.

The Supreme Court has held that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). Likewise, an employer's providing varying reasons for an employment decision may be evidence that the stated reasons were pretextual, "for one who tells the truth need not recite different versions of the supposedly same event." *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997).

Clearwater also said that Tenny was fired because he worked 2.5 hours of unauthorized overtime and for "engaging third-party vendors into company personnel

matters." Again, there are questions whether these were fireable offenses under Clearwater's progressive discipline policy and the collective bargaining agreement.

Finally, questions exist regarding whether subjecting Tenny to a drug test was an adverse employment action, and whether Clearwater followed its own policy in deciding to drug test Tenny. Schmittle says it ordered the drug test because Tenny "was becoming extremely agitated beyond what he regarded as normal." *Def's SUF* ¶ 28. Clearwater's Drug and Alcohol Policy required written documentation by two of Defendant's managers or administrative employees prior to any test that "the employee's conduct or actions are indicative of alleged impairment." Schmittle, however, did not obtain written documentation of any alleged impairment prior to ordering Tenny to submit to the test, the results of which were negative, and, according to the Secretary, Schmittle did not subject other employees who became angry at work to suspicion-based drug tests.

For all of these reasons, the Court finds that granting Clearwater summary judgment in this case would be inappropriate. Accordingly, the Court will deny Clearwater's Motion.

## ORDER

IT IS ORDERED that Defendant Clearwater Paper Corporation's Motion for Summary Judgment (Dkt. 31) is DENIED.



DATED: July 30, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court